## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Task Force Officer Douglas Ruth, Drug Enforcement Administration, being duly sworn, depose and state as follows:

### I. INTRODUCTION

### Agent Background

1.  I am a Police Officer for the town of Hampton, New Hampshire, and have been so employed since June 2009. Since August 2012, I have held the rank of Detective. Since August 2015, I have been assigned as a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA") in Portsmouth, New Hampshire. I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2.  I have received training regarding narcotics investigations while attending the 150th New Hampshire Police Standards and Training Police Academy and have attended additional specialized training courses in furtherance of my past and current assignments.

3.  I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have

1

also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

## Purpose of the Affidavit

4. I submit this affidavit in support of an application for a criminal complaint charging Germania AMPARO with Possession with Intent to Distribute and Distribution of 40 Grams or More of Fentanyl on July 13, 2021, in violation of Title 21, United States Code, Sections 841(a)(1) & (b)(1)(B)(vi) (hereinafter, the "Charged Offense").

5. Based on the facts set forth in this affidavit, there is probable cause to believe that AMPARO has committed the Charged Offense.

6. As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, among other things. I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint. Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## II. **PROBABLE CAUSE**

### Background of Investigation

7. Since at least February 2021, investigators have been investigating AMPARO for distribution of controlled substances, including oxycodone pills and suspected fentanyl powder, in the Andover/Lawrence areas of Massachusetts. Investigators have conducted multiple controlled

purchases of suspected fentanyl and oxycodone from AMPARO between February and July 2021. For each of these transactions, an undercover officer ("UC") communicated with AMPARO via recorded calls and/or text messages with (917) 214-9124 (the "AMPARO Phone").

8.      In February 2021, UC received a text message from the AMPARO Phone. The sender, later identified as AMPARO, identified herself as "Tito ex-wife" and stated, "I'm with the business, I have good price and quality....anything you need I am at your service, I can give you a sample to try."[1]  I believe AMPARO told UC that she was involved in the drug distribution business and could provide UC with any drugs UC needed, and that she would provide a sample of the drugs first. UC and AMPARO exchanged several text messages negotiating prices of fentanyl and discussing AMPARO's ability to sell oxycodone pills. UC and AMPARO agreed to meet on February 23, 2021.

9.      On February 23, 2021, investigators placed surveillance around the meeting location. The UC drove to the meeting location and when he arrived, exchanged text messages with AMPARO on the AMPARO phone. In a text message, AMPARO stated, "I canr [sic] see you?" and then stated, "[G]o back for chilis in the hotel there are many people[.]"  I believe AMPARO was concerned about the drug deal being observed and asked UC to move to a location where detection by law enforcement would be less likely. Once UC relocated, he exited his vehicle and approached AMPARO's vehicle. AMPARO handed UC a small clear bag containing four round blue pills marked "M" and "30" and a small clear plastic bag containing a tan powder substance. Although UC had audio / visual recording equipment in his vehicle, because the deal occurred outside UC's vehicle, there is no recording. A field test of the blue pills was

---

[1] After the February 23, 2021 meeting described below, UC reviewed the Massachusetts driver's license photograph for AMPARO and recognized her as the female operator of the Accord with whom he had met.

inconclusive, but a field test of the tan powder indicated a positive result for fentanyl. Based on my training and experience, and the color and consistency of the suspected narcotics, I believe the tan powder contains fentanyl. I further believe the blue pills were either actual or counterfeit oxycodone-type pills which may also contain fentanyl. Both substances were sent to the DEA's Northeast Regional Laboratory, and the results are pending.

10. For this February 23 deal, AMPARO drove a white Honda Accord bearing Massachusetts Registration 9PS771 (the "Accord"), which is registered to AMPARO at 30 Shattuck Road, Unit 4210, Andover, Massachusetts.

**March 4, 2021: AMPARO Delivered 35 Blue Pills of Suspected Fentanyl and/or Oxycodone**

11. Between February 23 and March 4, 2021, UC and AMPARO, using the AMPARO phone, continued to exchange text messages. In these messages, UC told AMPARO that he had $500 to purchase more pills like the sample AMPARO had provided on February 23, 2021. AMPARO directed UC to 30 Shattuck Road, the address at which the Accord is registered, where AMPARO provided UC with a clear plastic bag containing 35 round blue pills in exchange for $500. A field test of the pills produced an inconclusive result. Based on my training and experience, and the color and appearance consistency of the pills, I believe the pills were either actual or counterfeit oxycodone pills, which may also contain fentanyl. The pills were sent to the DEA's Northeast Regional Laboratory, and the results are pending.

**March 19, 2021: AMPARO Delivered 33 Blue Pills of Suspected Fentanyl and/or Oxycodone**

12. Between March 4 and 19, 2021, UC and AMPARO, using the AMPARO phone, continued to exchange text messages. In these text messages, AMPARO agreed to sell UC 33 pills purported to be oxycodone, for $500. They agreed to meet at 30 Shattuck Road. Prior to

the meeting, investigators set up surveillance and observed the Accord parked outside the building. UC's vehicle was equipped with an audio / video recording device. Once UC arrived in the parking lot of the meeting location, AMPARO approached and entered UC's vehicle. Once AMPARO entered UC's vehicle, another investigator called the AMPARO phone, and UC observed AMPARO's cell phone ring and the screen show "No Caller ID." This exercise confirmed that AMPARO was in possession of the AMPARO phone. While inside UC's vehicle, AMPARO, with the use of a translation application on her phone, and UC spoke about one of AMPARO's drug customers in Maine who purchased 400 grams of fentanyl at a time to take back to Maine. Once in Maine, the customer repackaged the fentanyl in smaller quantities for sale to his customers. During the meeting, AMPARO handed UC a small clear bag containing 33 round blue pills in exchange for $500. A field test of the pills produced an inconclusive result. Based on my training and experience, and the color and appearance of the pills, I believe the pills were either actual or counterfeit oxycodone pills which may also contain fentanyl. The pills were sent to the DEA's Northeast Regional Laboratory, and the results are pending.

13. Between March 19 and May 6, 2021, UC continued to exchange text messages with AMPARO. UC asked to purchase "7 sticks" or 70 grams of fentanyl in exchange for $1,000. AMPARO told UC that she was on vacation in the Dominican Republic until May 6, 2021, but provided UC with two telephone numbers for an associate from whom UC could pick up the fentanyl in the meantime.

**May 12, 2021: AMPARO Delivered ~70 Grams of Suspected Fentanyl**

14. On May 12, 2021 at approximately 1:34 p.m., UC sent a text message to AMPARO on the AMPARO phone stating, "I'll grab another 7 sticks," referring to 70 grams of fentanyl.

AMPARO responded, "No problem." UC drove to 30 Shattuck Road and parked to wait for AMPARO. Investigators established surveillance around the meeting location.

15. At approximately 2:30 p.m., AMPARO sent UC a text message stating, "Ok im here one sc [sic]." Shortly thereafter, UC observed AMPARO walking towards the undercover vehicle. She then entered the passenger side of the undercover vehicle, which was equipped with audio / video recording equipment.

16. When AMPARO entered the undercover vehicle, she apologized: "Sorry for making you wait, I had to prepare it," which UC understood to mean that AMPARO had to process and package the fentanyl. AMPARO then handed UC a black plastic bag. Inside the black plastic bag were seven cylinders of pressed tan powder, each wrapped in wax paper. UC provided AMPARO with $1,000 of official funds, and AMPARO exited the undercover vehicle and walked toward the entrance of the apartments at 30 Shattuck Road.

17. A field test of the powder produced a positive result for fentanyl. Based on my training and experience, and the color and consistency of the pressed powder, I believe the powder contains fentanyl. The powder was sent to the DEA's Northeast Regional Laboratory, and the results are pending. Based on the above, I believe AMPARO distributed approximately 70 grams of fentanyl to UC on May 12, 2021.

### May 24, 2021: AMPARO Delivered ~70 Grams of Suspected Fentanyl

18. On May 24, 2021, between approximately 12:56 p.m. and 1:08 p.m., UC and AMPARO, using the AMPARO phone, exchanged text messages regarding another fentanyl transaction. At approximately 1:01 p.m., UC sent a text message to AMPARO asking for "another 7," referring to an additional seven "sticks," or 70 grams of fentanyl. UC asked

AMPARO how long it would take her to prepare the fentanyl, and in response, AMPARO asked, "When do you arrive?" UC told AMPARO he would arrive in 25-30 minutes. AMPARO asked UC if he also wanted pills, but UC declined, and told AMPARO he would pick up pills next time.

19. At approximately 1:28 p.m., UC drove to 30 Shattuck Road and then sent a text message informing AMPARO of his arrival. AMPARO responded, "Give me about 5 minutes to get it, it's close," which UC understood to mean that AMPARO needed to pick up the drugs at a nearby stash location. Investigators established surveillance in the area of 30 Shattuck Road.

20. AMPARO arrived at 30 Shattuck Road at approximately 1:46 p.m. in the Accord and entered the undercover vehicle, which was equipped with audio / video recording equipment. Inside, AMPARO handed UC a black Saks Fifth Avenue shopping bag containing a clear plastic bag. Inside the clear plastic bag were seven cylinders of pressed tan powder, each wrapped in wax paper. UC handed AMPARO $1,000. AMPARO exited the undercover vehicle and walked toward the entrance of the apartments at 30 Shattuck Road.

21. A field test of the powder produced a positive result for fentanyl. Based on my training and experience, and the color and consistency of the pressed powder, I believe the powder contains fentanyl. The powder was sent to the DEA's Northeast Regional Laboratory, and the results are pending. Based on the above, I believe AMPARO distributed approximately 70 grams of fentanyl to UC on May 24, 2021.

**May 27, 2021: AMPARO Delivered ~70 Grams of Suspected Fentanyl**

22. On May 27, 2021, beginning at approximately 9:59 a.m., UC exchanged text messages with AMPARO, using the AMPARO phone. In a text message, UC asked AMPARO for "another 7," referring to another seven "sticks," or 70 grams of fentanyl. AMPARO agreed

to meet UC in Salisbury, Massachusetts.

23. At approximately 12:40 p.m., AMPARO sent UC a text message stating that she had arrived at the prearranged meeting location. Several minutes later, AMPARO again texted UC, noting that she had moved to a nearby location. At approximately 12:50 p.m., UC arrived at the new location. AMPARO exited the Accord and entered the undercover vehicle, where she handed UC a clear plastic bag containing seven cylinders of pressed tan powder in exchange for $1,000. AMPARO exited the undercover vehicle, returned to the Accord, and drove away. The meeting was recorded.

24. A field test of the powder produced a positive result for fentanyl. Based on my training and experience, and the color and consistency of the pressed powder, I believe the powder contains fentanyl. The powder was sent to the DEA's Northeast Regional Laboratory, and the results are pending. Based on the above, I believe AMPARO distributed approximately 70 grams of fentanyl to UC on May 27, 2021.

### June 8, 2021: AMPARO Delivered ~70 Grams of Suspected Fentanyl

25. On June 8, 2021, at approximately 10:52 a.m., UC initiated a series of text messages with AMPARO, on the AMPARO phone, to purchase 70 grams of fentanyl. They agreed to meet at 4:00 p.m. that day in Amesbury, Massachusetts. Investigators established surveillance in the area of the meeting location.

26. At approximately 3:43 p.m., AMPARO arrived at the meeting location in a shopping plaza parking lot in the Accord. UC then traveled to the meeting location. When UC arrived, AMPARO drove the Accord to park next to the undercover vehicle, which she then entered. Inside, AMPARO handed UC seven cylinders of pressed tan powder, each wrapped in

wax paper, and all together wrapped in green cellophane in exchange for $1,000. AMPARO exited the undercover vehicle, returned to the Accord, and drove away. The meeting was audio / video recorded.

27. A field test of the powder produced a positive result for fentanyl. Based on my training and experience, and the color and consistency of the pressed powder, I believe the powder contains fentanyl. The powder was sent to the DEA's Northeast Regional Laboratory, and the results are pending. Based on the above, I believe AMPARO distributed approximately 70 grams of fentanyl to UC on June 8, 2021.

### July 1, 2021: AMPARO Delivered ~70 Grams of Suspected Fentanyl

28. On July 1, 2021, at approximately 10:24 a.m., UC initiated a series of text messages with AMPARO, on the AMPARO phone, to purchase 70 grams of fentanyl. They agreed to meet at 12:45 p.m. that day in Amesbury, Massachusetts. Investigators established surveillance in the area of the meeting location.

29. UC then traveled to the meeting location. At approximately 12:39 p.m., AMPARO arrived at the meeting location in a shopping plaza parking lot in the Accord. AMPARO sent UC a text message stating, "Im here[.]" AMPARO drove past UC's vehicle and sent another text message stating, "[T]here is someone in the car on the side…I'm going to move somewhere else." I believe AMPARO was concerned with this person observing the drug deal and wanted to move to a more secluded location. UC pulled out of his parking spot and followed AMPARO as she drove to the back of the shopping plaza. Once both UC and AMPARO were parked, UC exited his vehicle and entered the Accord. Inside the Accord, AMPARO handed UC seven cylinders of pressed tan powder, each wrapped in wax paper, in a clear plastic bag. UC

paid AMPARO $1,000. UC exited AMPARO's vehicle and AMPARO drove away from the meeting location. The meeting was audio / video recorded.

30. A field test of the powder produced a positive result for fentanyl. Based on my training and experience, and the color and consistency of the pressed powder, I believe the powder contains fentanyl. The powder was sent to the DEA's Northeast Regional Laboratory, and the results are pending. Based on the above, I believe AMPARO distributed approximately 70 grams of fentanyl to UC on July 1, 2021.

### July 13, 2021: AMPARO Delivered ~70 Grams of Suspected Fentanyl

31. On July 7, 2021, at 8:13 p.m., UC communicated with AMPARO, on the AMPARO phone, via text message. UC requested 70 grams of fentanyl. AMPARO replied, "Today unfortunately I will not be able to, I have nothing ready and the one that brings me the material is not available, can you come tomorrow afternoon." I understood this communication to mean that AMPARO did not have fentanyl ready for sale and her source of supply was not available to resupply her.

32. On July 12 and 13, 2021, UC communicated with AMPARO, on the AMPARO phone, via text messages. AMPARO agreed to sell UC 70 grams of fentanyl. They agreed to meet in Amesbury at 12:30 p.m. on July 13, 2021.

33. At approximately 12:20 p.m., investigators set up surveillance around the meeting location. At approximately 12:25 p.m., UC arrived at the meeting location. At approximately 12:27 p.m., AMPARO arrived at the meeting location in the Accord and parked next to the undercover vehicle. AMPARO entered the undercover vehicle, where she handed UC a white plastic bag containing a smaller clear plastic bag with seven cylinders of pressed tan powder, each

wrapped in wax paper, and one smaller baggie with loose tan powder, in exchange for $1,000. AMPARO then exited the undercover vehicle, reentered the Accord and drove away. This meeting was audio / video recorded.

34. A field test of the powder produced a positive result for fentanyl. Based on my training and experience, and the color and consistency of the pressed and loose powder, I believe the powder contains fentanyl. The powder was sent to the DEA's Northeast Regional Laboratory, and the results are pending. Based on the above, I believe AMPARO distributed approximately 70 grams of fentanyl to UC on July 13, 2021.

### III. CONCLUSION

35. Based on all of the above, there is probable cause to believe that AMPARO committed the Charged Offense.

I declare that the foregoing is true and correct.

_____
Douglas Ruth
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn via telephone in accordance with Fed. R. Crim. P. 4.1, on this **Feb 22, 2022** day of February 2022.

_____
HON. JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS